UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA

v.                                          Crim. No. 05-451-01 (RCL)

RENE OSWALD COBAR, <u>et al</u>.


DEFENDANT COBAR'S MOTION TO DISMISS INDICTMENT FOR LACK OF VENUE
WITH SUPPORTING POINTS AND AUTHORITIES


JAMES L. LYONS
KELLOGG, WILLIAMS & LYONS
1925 K STREET, N.W., #200
WASHINGTON, D.C.  20006
COUNSEL FOR RENE OSWALD COBAR

**INDEX**

Page

INTRODUCTION................................................ 1

BACKGROUND.................................................. 3

    A.   The Las Vegas Police/DEA "Sting" Investigation
        of Rene Cobar..................................... 3

    B.   The Gutierrez Drug Deal -- Failure to Proceed..... 5

    C.   A New Drug Deal -- Cobar, Flaco, and Lucho........ 6

    D.   The Cobar/Flaco/Lucho Drug Deal -- Failure to
        Proceed........................................... 9

    E.   The Cobar/Flaco/Lucho Drug Deal -- Charged
        By Federal Indictment in Las Vegas, Nevada........ 10

        1.   The Proceedings in Las Vegas, Nevada......... 11

        2.   The Government's Decision to Indict in D.C... 12

ARGUMENT.................................................... 13

    THE INDICTMENT IN THIS CASE MUST BE DISMISSED
    FOR LACK OF VENUE IN THE DISTRICT OF COLUMBIA.......... 13

    A.   The Constitutional Venue Protections of
        Article III and the Sixth Amendment............... 13

    B.   The Conspiracy Charged in the Indictment.......... 17

    C.   The Law of Venue in Conspiracy Cases.............. 19

        1.   The Nature of the Crime of Conspiracy........ 19

        2.   Where a Conspiracy Is Deemed To Have
            Been Committed for Purposes of Venue
            under Article III ........................... 20

    D.   The Conspiracy in this Case Was Committed in
        One or More States of the United States and Thus
        May Not Be Constitutionally Prosecuted in the
        District of Columbia under 21 U.S.C. § 959(c)
        or 18 U.S.C. § 3238............................... 21

1.  The Conspiracy in this Case Was Formed in
    Las Vegas, Nevada, and Thus Was Committed
    in the State of Nevada....................... 22

2.  The Conspiracy in this Case Was Furthered
    in Las Vegas, Nevada, and in Miami, Florida,
    and Thus Was Committed in the States of
    Nevada and Florida........................... 24

3.  Flaco and Lucho's Lack of Physical Presence
    in the United States Does Not Mean that They
    Did Not Commit the Conspiracy in the States
    of Nevada and Florida for Purposes of
    Article III and Sixth Amendment Venue....... 25

4.  Under the Facts of this Case, the Conspiracy
    May Not Be Constitutionally Prosecuted under
    21 U.S.C. § 959(c) or 18 U.S.C. § 3238....... 28

    a.  The Government Has the Burden To Show
        that Venue Is Proper under § 959(c)
        or § 3238............................... 28

    b.  The Government Cannot Meet Its Burden
        To Show that Venue Is Proper under
        § 959(c) or § 3238...................... 29

5.  Defendant Cobar Does Not Waive His
    Constitutional Venue Rights in this Case..... 37

CONCLUSION.................................................. 39

CERTIFICATE OF SERVICE..................................... 40

## TABLE OF CASES*

Batson v. Kentucky, 476 U.S. 79 (1986)..................... 38

*Burton v. United States, 202 U.S. 344 (1906).............. 26

Duncan v. Louisiana, 391 U.S. 145 (1968).................. 38

*Gerstein v. Pugh, 420 U.S. 103 (1975).................... 31

Hyde v. Shine, 199 U.S. 62 (1905)..................... 20, 21

*Hyde v. United States, 225 U.S. 347 (1911)............. 19, 20

_____

* Cases chiefly relied on are marked with an asterisk.

ii

*Jones v. United States, 137 U.S. 202 (1890)............... 18

*Salinas v. United States, 522 U.S. 52 (1997).............. 19

*Travis v. United States, 364 U.S. 631 (1961)........... 16, 17

 United States v. Angotti, 105 F.3d 539 (9th Cir. 1997)..... 28

*United States v. Anderson, 328 U.S. 699 (1946).......... 17, 19

 United States v. Andrews, 598 F. Supp. 297
          (W.D. Wisc. 1984).................................. 26

*United States v. Barnes, 681 F.2d 717 (11th Cir. 1982)..... 26

*United States v. Bartoli, 192 F.2d 130 (4th Cir. 1951)..... 26

*United States v. Brika, 416 F.3d 514 (6th Cir. 2005)....... 35

*United States v. Cabrales, 524 U.S. 1 (1998).... 14, 16, 17, 19

*United States v. Carey, 152 F. Supp.2d 415 (S.D.N.Y. 2001). 37

 United States v. Chin, 378 F.3d 151 (2nd Cir. 2004)........ 28

 United States v. Cordero, 668 F.2d 32 (1st Cir. 1981)....... 26

*United States v. Cores, 356 U.S. 405 (1958)............... 16

*United States v. Corona, 34 F.3d 876 (9th Cir. 1994).... 25, 28

*United States v. Dawson, 56 U.S. 467 (1853)............... 17

*United States v. Duque, 123 Fed.Appx. 447 (2nd Cir. 2005)... 26

 United States v. Evans, 62 F.3d 1233 (9th Cir. 1995)........ 37

*United States v. Gilboe, 684 F.2d 235 (2nd Cir. 1982)... 27, 33

*United States v. Goldberg, 830 F.2d 459 (3rd Cir. 1987)..... 16

 United States v. Grammatikos, 633 F.2d 1013 (2nd Cir. 1980). 20

*United States v. Haire, 371 F.3d 833 (D.C. Cir. 2004),
          vacated on Booker grounds, 125 S.Ct. 1014 (2005).. 21

 United States v. Hart-Williams, 967 F. Supp. 73
          (E.D.N.Y. 1997).................................... 36

*United States v. Hilger, 867 F.2d 566 (9th Cir. 1989)...... 39

 United States v. Iannelli, 420 U.S. 770 (1975)............. 19

iii

*<u>United States</u> v. <u>Jackalow</u>, 66 U.S. 484 (1861).............. 17

*<u>United States</u> v. <u>Jimenez Recio</u>, 537 U.S. 270 (2003)........ 19

*<u>United States</u> v. <u>Johnson</u>, 323 U.S. 273 (1944)....... 16, 17, 38

<u>United States</u> v. <u>Johnson</u>, 575 F.2d 1347 (5th Cir.),
        <u>cert</u>. <u>denied</u>, 440 U.S. 907 (1978)................ 20

*<u>United States</u> v. <u>Kim</u>, 246 F.3d 186 (2nd Cir. 2001)......... 27

*<u>United States</u> v. <u>Lam Kwong-Wah</u>, 924 F.2d 298
        (D.C. Cir. 1991)............................... 21, 28

<u>United States</u> v. <u>Mayo</u>, 721 F.2d 1084 (7th Cir. 1984)....... 21

*<u>United States</u> v. <u>Morgan</u>, 393 F.3d 192 (D.C. Cir. 2005).. 16, 19

<u>United States</u> v. <u>Mosuro</u>, 648 F. Supp. 316 (D.D.C. 1986)..... 31

*<u>United States</u> v. <u>Myers</u>, 847 F.2d 1408 (9th Cir. 1988)....... 25

*<u>United States</u> v. <u>Naranjo</u>, 14 F.3d 145 (2nd Cir. 1994)....... 26

<u>United States</u> v. <u>Nicoll</u>, 664 F.2d 1308 (5th Cir. 1982)...... 21

*<u>United States</u> v. <u>Palma-Ruedas</u>, 121 F.3d 841 (3rd Cir. 1997). 16

*<u>United States</u> v. <u>Parrish</u>, 736 F.2d 152 (5th Cir. 1984)...... 25

<u>United States</u> v. <u>Ramirez-Amaya</u>, 812 F.2d 813
        (2nd Cir. 1987).................................. 21

<u>United States</u> v. <u>Reed</u>, 773 F.2d 477 (2nd Cir. 1985)......... 35

<u>United States</u> v. <u>Robinson</u>, 275 F.3d 371 (4th Cir. 2004)..... 28

<u>United States</u> v. <u>Rodriguez-Moreno</u>, 526 U.S. 275 (1999)...... 19

<u>United States</u> v. <u>Salinas</u>, 373 F.3d 163 (1st Cir. 2004)...... 28

<u>United States</u> v. <u>Shabani</u>, 513 U.S. 10 (1994)............... 20

*<u>United States</u> v. <u>Socony-Vacuum Oil Co</u>., 310 U.S. 150 (1939). 19

*<u>United States</u> v. <u>Spriggs</u>, 102 F.3d 1245 (D.C. Cir. 1996).... 16

*<u>United States</u> v. <u>Strickland</u>, 493 F.2d 182 (5th Cir. 1974)... 26

<u>United States</u> v. <u>Swann</u>, 441 F.2d 1053 (D.C. Cir. 1971)...... 39

United States v. Wood, 364 F.3d 704 (6th Cir. 2004)......... 28

United States v. Yonn, 702 F.2d 1341 (11th Cir. 1983)....... 20

*Whitfield v. United States, 160 L.Ed.2d 611 (2005)...... 20, 21

**OTHER AUTHORITIES**

Article III, § 2, cl. 3.................................. passim

Sixth Amendment of the United States Constitution....... passim

Rule 18 of the Federal Rules of Criminal Procedure.......... 14

The Declaration of Independence (1776)..................... 16

4 W. Blackstone, Commentaries on the Laws of England (Cooley
    Edition 1899)........................................... 38

Albert W. Alschuler & Andrew G. Deiss, A Brief History of
    the Criminal Jury in the United States,
    61 U. Chi. L. Rev. 867 (1994)........................... 16

Annot., Proper Venue -- Drug Conspiracy,
    74 ALR Fed. 669 (1985).................................. 20

Developments in the Law of Criminal Conspiracy,
    72 Harv. L. Rev. 920 (1959)........................ 19, 21

Note, Stretching Venue Beyond Constitutional Recognition,
    90 Journal of Criminal Law & Criminology 951 (2000).... 15

Charles A. Wright, Federal Practice and Procedure, § 301
    (1969).................................................. 14

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**UNITED STATES OF AMERICA**

**v.**

**RENE OSWALD COBAR, <u>et al</u>.**

Crim. No. 05-451-01 (RCL)

---

**DEFENDANT COBAR'S MOTION TO DISMISS INDICTMENT FOR LACK OF VENUE**
**<u>WITH SUPPORTING POINTS AND AUTHORITIES</u>**

**<u>INTRODUCTION</u>**

By indictment filed December 20, 2005, defendants Rene
Oswald Cobar, Luis Angel Gonzalez-Largo (a/k/a "Lucho"), and
Victor Manuel Cruz-Garcia (a/k/a "Flaco") stand charged with one
count of conspiracy to distribute five kilograms or more of
cocaine intending and knowing that the cocaine would be
unlawfully imported into the United States, in violation of
21 U.S.C. § 963 and 21 U.S.C. §§ 959 and 960.[1]

Specifically, the indictment alleges that from September 26,
2003, and continuing up to and including April 13, 2004, the
defendants (and other unindicted co-conspirators) in Guatemala,
Nicaragua, and elsewhere, conspired to distribute five kilograms
or more of cocaine, knowing that the drugs would be imported into

---

[1]   The indictment also charges aiding and abetting the
conspiracy, in violation of 18 U.S.C. § 2.

1

the United States from Guatemala, Nicaragua, and from elsewhere outside of the United States.[2]

Venue in the District of Columbia appears to be predicated on 21 U.S.C. § 959(c), which provides that one who distributes drugs outside the United States knowing that the drugs will be eventually imported into the United States "shall be tried in the United States district court at the point of entry where the person enters the United States, or in the United States District Court for the District of Columbia."[3]

As we show _infra_, assuming defendant Cobar and his co-defendants committed a § 963 conspiracy to violate § 959,[4] they committed the conspiracy in the State of Nevada where they entered into the conspiracy and in the States of Nevada and

_____

[2]    The indictment was prepared by trial attorneys in the Criminal Division of the Department of Justice ("DOJ").  In contrast to the detailed indictments in conspiracy cases prepared by Assistant United States Attorneys in this jurisdiction -- with a statement of goals of the conspiracy; manner and means of committing the conspiracy; roles in the conspiracy of the named defendants; and a listing of some or all of the alleged overt acts in furtherance of the conspiracy -- the indictment in this case contains nothing more than a one-paragraph "bare bones" allegation of conspiracy.

[3]    As we discuss _infra_ at 33-34, venue also might be predicated on 18 U.S.C. § 3238, which deals with "offenses not committed in any district."

[4]    For purposes of this motion only, defendant Cobar assumes the following:  (1) that persons named "Cobar" and "Lucho" in the discovery materials are in fact defendants Rene Oswald Cobar and Luis Angel Gonzales-Largo; (2) that the person named "Victor" and "Flaco" in the discovery materials is in fact defendant Victor Manuel Cruz-Garcia; (3) that the acts ascribed to the defendants in the discovery materials and the indictment are true; and (4) that the acts ascribed to defendants establish a § 963 conspiracy to violate § 959(a).
    Nothing in this motion should be considered as a direct or indirect admission by defendant Cobar (or by his co-defendants) of any of the acts described in the discovery materials or alleged in the indictment.

Florida where they performed overt acts in furtherance of the conspiracy; they did not commit the conspiracy in the District of Columbia through overt acts or otherwise.[5]

Article III, § 2, cl. 3 of the United States Constitution gives defendant Cobar the right to be tried "in the State where the [conspiracy] shall have been committed," _i.e._, the State of Nevada where the conspiracy was formed and where overt acts in furtherance of the conspiracy were committed, or the State of Florida where other conspiratorial overt acts were committed.

Thus, because of primacy of Article III, § 2, cl. 3 over the venue provisions of 21 U.S.C. § 959(c) and 18 U.S.C. § 3238, defendant Cobar has a constitutional right <u>not</u> to be tried in the District of Columbia.

Accordingly, because defendant Cobar chooses not to waive his constitutional venue protections, the indictment against him must be dismissed.

<u>**BACKGROUND**</u>

**A.    The Las Vegas Police/DEA "Sting" Investigation of Rene Cobar**

In August 2003, a confidential informant ("CI") provided information to the Las Vegas, Nevada, Metropolitan Police Department ("LVMPD") that defendant Cobar, who lived in Las Vegas, was engaged in drug trafficking with sources in

---

[5]    None of the drug trafficking activities attributed to the defendants in the discovery materials and in the indictment occurred in the District of Columbia.

Guatemala.[6]  (DISC 00164-00167)  The LVMPD decided to set up a
"sting" operation to try and get Cobar to sell drugs to an
undercover LVMPD officer.

On September 26, 2003,[7] the CI (known to Cobar as "Carlos")
introduced Cobar to undercover LVMPD Detective Orestes Guerra
(using the name "Favio") at the Bahama Breeze Restaurant in Las
Vegas.  Detective Guerra presented himself as one who was
interested in making a multi-kilogram purchase of cocaine powder.
He told Cobar that he was willing to buy 400 kilos of cocaine at
$7,000/kilo for a total of $2.8 million, but that he would need
some time to get his money together.  (DISC 00009-00010; 00168-
00172)  A few days later, at LVMPD's request, the DEA in Las
Vegas agreed to help LVMPD pursue the "sting" operation against
Cobar.  (DISC 00001; 00009-00010)

On October 9, 2003, Guerra and the CI met Cobar at the
Yolies Brazilian Steak House in Las Vegas, where they had further
discussions about the 400 kilo deal.  Guerra said that he was not
yet ready.  Cobar indicated that he had a female contact in
Guatemala (Dora Gutierrez) with drug connections who perhaps
could do the 400 kilo deal.  (DISC 00173-00175)

---

[6]  The statements in this section of our pleading are taken from
the 4622 pages of discovery materials provided by DOJ to date.  The
materials are bate-stamped on the lower right hand corner of the pages
from "DISC 00001" to "DISC 04622."  For convenience of the parties, we
have cited the bate-stamp numbers of the pages that support the
particular statements made herein.  Unless indicated otherwise, e.g.,
"Exhibit __," we have not included the cited pages as an attachment to
the motion.

[7]  September 26, 2003, is the start of the conspiracy as alleged
in the indictment.

On October 15, 2003, Guerra and the CI met with Cobar at the Bahama Breeze Restaurant for further negotiations.  Cobar said that he had spoken with Gutierrez in Guatemala and that she and her drug suppliers were willing to do the deal under Guerra's terms, i.e., the cocaine would be picked up by Guerra in Guatemala and payment would be made in the United States.  (DISC 00178-00180)

On November 4, 2003, at a meeting at PT's Pub in Las Vegas, Guerra told Cobar that he was ready to complete the 400 kilo deal and that he had an employee, Jorge Rivera,[8] who would be in Panama City the week of November 17, and he suggested that Gutierrez meet Jorge in Panama City to work out the deal.  Later that day, Cobar confirmed with Guerra that Gutierrez would meet Guerra's man in Panama City, provided Guerra picked up the expenses for the trip.  (DISC 00181-00185)

On November 17, 2003, as part of the "sting," Guerra took Cobar to a Bank of America branch in Las Vegas and got a printout of his purported account at the bank which showed a balance of $3,156,726.23.  This left no doubt in Cobar's mind that Guerra had the finances to do a 400 kilo deal at $7,000 per kilo.  (DISC 00187-00189; 00191-00192)

**B.    The Gutierrez Drug Deal -- Failure to Proceed**

On November 19, 2003, Dora Gutierrez and Jorge Rivera met in

---

[8]  Guerra's employee, Jorge Rivera, was undercover Inspector Gustavo Jorge of the Policia Tecnica Judicial ("PTJ") in Panama City. (DISC 00024)

Panama City[9] but the two could not come to a mutual agreement about price and delivery and the 400 kilo deal was not consummated.[10]  Later that day, at a meeting at PT's Pub, Guerra told Cobar about the problems of dealing with Gutierrez and they agreed that if the deal could not be done with her, they would use Cobar's backup source.  (DISC 00024; 00192-00197; 01758-01777)

A few days later, Guerra, the CI and Cobar met at PT's Pub and it was agreed to abort any further dealings with Gutierrez[11] and to use Cobar's backup source instead.  (DISC 00199-00200)

C.    **A New Drug Deal -- Cobar, Flaco, and Lucho**[12]

On December 5, 2003, Cobar talked to Carlos (the CI) who stressed that Favio was going to take his business elsewhere unless Cobar could put a deal together in short order.  (DISC 00213; 02544)  The next day, Cobar called Flaco from Las Vegas to talk over a possible 400 kilo cocaine deal with Guerra.  (DISC

---

[9]  On November 10, 2003, Guerra sent a $782.28 money order to Gutierrez in Guatemala to cover her travel expenses to meet Guerra's man in Panama City.  (DISC 00011; 00183)

[10]  Gutierrez called Guerra from Panama City and said she wanted him to fly her to Las Vegas so that she could deal with him face-to-face.  (DISC 00024)

[11]  Gutierrez was not part of the drug operation involving defendants Gonzalez-Largo and Cruz-Garcia; she had direct ties to a Colombian drug cartel.  (DISC 00037-00041; 00213; 02544)

[12]  As noted, for purposes of this motion only, we assume that the persons named Cobar, Flaco (sometimes called Victor), and Lucho in the discovery materials are in fact the defendants in this case.  See fn. 4 at 2.

02534)[13]

On December 8, 2003, Cobar again called Flaco from Las Vegas, telling him that his client (Guerra) had the money and was ready to go.  Flaco replied that he would send Cobar the name and phone number of his drug source for the Guerra deal.  (DISC 02505)

The next day, Cobar called Flaco from Las Vegas and asked to do the deal in Panama, and Flaco guaranteed that he could deliver 400 kilos of cocaine in Panama.  (DISC  02483)

On December 10, 2003, Cobar called Flaco from Las Vegas and Flaco advised that Lucho, his supplier, whom Cobar had not yet talked to, had 800 kilos of cocaine in Panama and that he wanted to know whether to set aside 400 kilos for Cobar's client.  After discussing the method of payment for the drugs and the background and reliability of Lucho, Flaco suggested that Cobar speak directly with Lucho, who at the time was in Costa Rica.  (DISC 02471-02473)

A few minutes later, Cobar called Lucho from Las Vegas and introduced himself.[14]  Lucho said he had talked to Flaco about the deal for Cobar's client in Las Vegas and that he delivered the 400 kilos of cocaine in Panama.  Cobar said he would meet with his client the next day to discuss a possible meeting between the client and Lucho in Panama.  (DISC 02243; 02470)  The

---

[13]  See also DISC 02539-02540.

[14]  Cobar obtained Lucho's name and his phone number in Costa Rica from Flaco a few days before.  (DISC 02505)

next day, Cobar phoned Guerra and told him that the cocaine deal would have to take place in Panama and the price would be only $4,000 per kilo for 400 kilos.  (DISC 00214)

On December 13, 2003, Cobar called Lucho from Las Vegas and Lucho instructed Cobar that he wanted his share of the proceeds for the 400 kilos to be paid in cash.  (DISC 02246)  That same day, Cobar called Guerra and advised him that his people wanted $3,000 per kilo paid in cash in Panama, with the remaining $1,000 per kilo to be paid to Cobar in Las Vegas.  (DISC 02431)  The next day, Guerra called Cobar and agreed to the proposed payment terms.  (DISC 00214)

On December 15, 2003, at a meeting at PT's Pub, Guerra notified Cobar that the deal had to be postponed.  Cobar told Guerra that he was anxious to do the deal as soon as possible because he and his family were moving to Miami, Florida, at the end of the month.  Guerra agreed to come to Miami in January to complete the deal.  (DISC 00215)  The next day, Cobar called Flaco and Lucho from Las Vegas and advised them that the deal had been delayed until early 2004.  (DISC 02418-02421; 02247)

On December 28, 2003, Cobar called Guerra from Miami, Florida, and said the drugs could be delivered any day after January 2, 2004, and a few weeks later Guerra advised Cobar in Miami that he was ready to proceed.  (DISC 00216; 00219; 02399)

On January 24, 2004, Cobar called Flaco from Miami and confirmed the 400 kilo deal for the second week in February and said that Lucho would soon receive a call from Jorge, who was the

8

client's contact in Panama.[15]  They agreed that the client would
pay Lucho $3,000 per kilo in Panama and that the $1,000
difference would be paid to Cobar in Miami and that Cobar would
then send Flaco his cut of the money.  Flaco advised Cobar that
Lucho would need four days' notice to get the drugs ready for
delivery.  (DISC 0094-0096)  On January 28, 2004, Cobar confirmed
with Guerra that everything was on track for the deal to go down
soon.  (DISC 00221)

> **D.   The Cobar/Flaco/Lucho Drug Deal -- Failure
>        to Proceed**

The Cobar/Flaco/Lucho deal to sell Guerra 400 kilos of
cocaine in Panama City turned out to be no more successful than
the earlier deal with Dora Gutierrez and her drug sources.

On February 3, 2004, Lucho met with Jorge in Panama City and
discussed the logistics of delivery and payment.  During the
meeting Guerra called and spoke directly with Lucho about
payment.  (DISC 00081; 00221; 01734; 02248)

On February 5, 2004, Guerra called Cobar in Miami and
assured him that the deal was going down and that Guerra would
make one payment upon delivery of the entire 400 kilos.  (DISC
00221)  On February 7, 2004, Guerra called Cobar again and
confirmed that he would pay Cobar's cut ($400,000) as soon as all
the drugs were delivered to Jorge.  (DISC 00222)

On February 11, 2004, Lucho called Jorge and said he had the
400 kilos at a safe place, but that he could not bring the drugs

---

[15]  Inspector Gustavo Jorge of the PTJ in Panama continued his
undercover role of Jorge Rivera, Guerra's man in Panama.

into the city at that time because the police were conducting checkpoint stops and the truck that Jorge had given him to transport the drugs was unsafe if stopped by the police.[16]  They agreed that Lucho would deliver the drugs the following morning. (DISC 01737-01738; 02249)

Also on February 11, 2004, Guerra and DEA Agent Michael Brito (who was posing as Guerra's man in Miami) met with Cobar at a bakery in Doral, Florida, and discussed the pending drug delivery by Lucho to Jorge in Panama.  (DISC 00222)  Later, Guerra called Cobar and said he had heard from Jorge that Lucho had postponed the deal until the next day.  (DISC 00223)

On February 12, 2004, the delivery that Lucho had promised to Jorge did not materialize because of logistical problems.  The bottom line was that Lucho returned Jorge's truck without the drugs and the deal was called off.  (DISC 00081; 00224)

During the next few days, Cobar called Guerra from Miami several times and the two discussed the possibility of doing the 400 kilo cocaine deal with one of Flaco's other drug sources, but the deal never came to pass.  (DISC 00224-00225)

E.    **The Cobar/Flaco/Lucho Drug Deal -- Charged By Federal Indictment in Las Vegas, Nevada**

On May 5, 2004, DEA Agent Anthony Casullo presented evidence to the Grand Jury in Las Vegas, Nevada, of the "sting" operation against Cobar, Flaco, and Lucho, involving the 400 kilo cocaine deal that was negotiated but not completed, as well as evidence

---

[16]  Jorge provided Lucho with a delivery truck earlier in the day.  (DISC 00081; 01735)

10

of a separate "sting" operation against Cobar and another individual (Filadelfo Jesus Sanabria), involving money laundering.[17]  (Exhibit A, DISC 01599-01624)

That same day, the Grand Jury returned an indictment charging Rene Oswald Cobar, Luis Angel Gonzalez-Largo (a/k/a "Lucho"), and Victor (LNU)[18] (a/k/a "Flaco") with the 400 kilo drug deal in Count One as follows:

> Beginning on or about September 26, 2003, and continuing up to and including April 13, 2004, in the State and Federal District of Nevada, [defendants] did knowingly and intentionally combine, conspire, confederate and agree together, with each other, and with others known and unknown, to commit offenses against the United States, that is, to distribute at least 5 kilograms or more of [cocaine], in violation of Title 21 United States Code, Section 841(a)(1), (b)(1)(A)(ii).  (Exhibit B)

The indictment also charged Cobar and Sanabria in Count Two with money laundering on or about March 22, 2004, to April 16, 2004, in violation of 18 U.S.C. § 1956 (a)(1)(B)(i) and (h).

1.  **The Proceedings in Las Vegas, Nevada**

On May 24, 2004, defendant Cobar was arraigned before United

---

[17]  During March, 2004, Guerra set in motion another "sting" operation against Cobar involving money laundering.  Guerra had a DEA Agent in New York City pose as a high-level money launderer.  This "sting" culminated with the arrests of Cobar and Sanabria on April 6, 2004, in New York City, when the two were caught allegedly trying to launder $210,000 in drug money.  (DISC 00118-00119; 00226-00230; 02303-02310; 02324)

[18]  As of March 5, 2004, the DEA had not yet identified the full name of "Victor/Flaco" who was one of the three persons involved in the 400 kilo cocaine deal.  On March 7, 2004, the CI identified the voice of Flaco from a Title III call as the voice of Victor Manuel Cruz-Garcia.  (DISC 00127-00128)

States District Court Judge James C. Mahan and entered a plea of
not guilty to both counts of the indictment.[19]  He was held
without bond.  The case was originally set for trial on July 13,
2004; thereafter, the trial date was continued several times.

On October 8, 2004, court-appointed counsel for Sanabria,
joined by court-appointed counsel for Cobar, filed a motion to
dismiss the money laundering charge, Count Two, for lack of
venue.  Counsel argued that although the indictment alleged that
Cobar and Sanabria were going to use financial institutions in
Nevada to launder the money at issue, the alleged agreement to do
so and the overt acts in furtherance of the agreement were not
committed in Nevada, but in New York and Florida, and in Texas,
where Cobar met Sanabria and allegedly set up the money
laundering deal.

By order filed February 8, 2005, Judge Mahan granted
defendants' motions and dismissed Count Two without prejudice.[20]

After several stipulated continuances, by order filed
August 4, 2005, the trial date for Cobar's case was set for
January 18, 2006.

###           2.     The Government's Decision to Indict in D.C.

In December 2005, notwithstanding that defendant Cobar was

---

[19]  On April 7, 2004, the day after their arrests in New York
City, Cobar and Sanabria were named in a criminal complaint in Las
Vegas, Nevada, for money laundering.  They were removed from New York
City to Las Vegas by order of the Southern District of New York dated
April 27, 2004.

[20]  Following the dismissal of Count Two, Sanabria was released
from custody while Cobar continued to be held without bond on Count
One, the narcotics conspiracy charge.

scheduled for trial on January 18, 2006, and had been held without bond since his arrest April 6, 2004, the United States Attorney's Office for Nevada and the Criminal Division of DOJ unilaterally decided for the convenience of the government to abort the case in Las Vegas, Nevada, and charge Cobar and his co-defendants in Washington, D.C., for essentially the same criminal activity as that charged in Count One of the Nevada indictment, i.e., the 400 kilo cocaine conspiracy involving Cobar, Gonzalez-Largo and Cruz-Garcia.  This decision was effected by the December 20, 2005, indictment against defendants in the District of Columbia.

On December 21, 2005, the government moved to dismiss the case against Cobar in Las Vegas without prejudice, which motion was granted by Judge Mahan on January 26, 2006.[21]

**ARGUMENT**

**THE INDICTMENT IN THIS CASE MUST BE DISMISSED
FOR LACK OF VENUE IN THE DISTRICT OF COLUMBIA.**

A.   **The Constitutional Venue Protections of Article III
     and the Sixth Amendment**

Article III, § 2, cl. 3 ("Article III") of the United States Constitution provides:

> The Trial of all Crimes, except in the
> Cases of Impeachment, shall be by Jury; and
> such Trial shall be held in the State where
> the said Crimes shall have been committed;
> but when not committed within any State, the

---

[21]   Defendant Cobar was removed from, Las Vegas, Nevada, to the District of Columbia, and in April 2006, defendants Cruz-Garcia and Gonzales-Largo, who had been in custody in Nicaragua, were brought to the District of Columbia to stand trial on the D.C. indictment.

> Trial shall be at such Place or Places as the
> Congress may by Law have directed.

The importance of the venue provision of Article III was reinforced by the Founding Fathers through the vicinage provision of the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."[22]

Rule 18 of the Federal Rules of Criminal Procedure implements the venue protections of Article III and the Sixth Amendment by providing that "[e]xcept as otherwise permitted by statute or by these rules, the prosecution shall be had in the district in which the offense was committed."[23]

---

[22]  Professor Charles Wright explains the relationship between venue and vicinage as follows:

> Strictly speaking [Article III] is a venue
> provision, since it fixes the place of trial,
> while [the Sixth Amendment] is a vicinage
> provision, since it deals with the place from
> which the jurors are to be selected.  This
> technical distinction has been of no importance.
> Although in theory both constitutional provisions
> could be satisfied by trying a defendant in one
> district of a state though the offense was
> committed in another district, so long as the
> jurors were selected from the district of the
> crime, no such procedure has ever been attempted,
> and it has been considered that the trial in the
> district of the offense is required.

Charles A. Wright, Federal Practice and Procedure, § 301, 579 (1969) (footnotes omitted).  See also United States v. Cabrales, 524 U.S. 1, 6, (1998) (finding no distinction between the vicinage and venue provisions of the Constitution).

[23]  In the words of the Supreme Court, Rule 18 "echoes the constitutional commands" of the venue provisions of Article III and the Sixth Amendment.  United States v. Cabrales, supra, 524 U.S. at 6.

14

The venue provisions of Article III and the Sixth Amendment, bolstered by Rule 18, were designed to protect at least three policy interests.  First, the provisions protect the rights of the accused  -- the accused is more likely to stand trial in a familiar venue; witnesses to the alleged crime are most likely to live in the area of the crime; tangible evidence of the crime is most likely to be found at the site of the crime; and the accused is also more likely to be tried in the area where he lives, allowing for the comfort and support of his or her family and friends and knowledge of local counsel.[24]

Second, the provisions check government power against the individual.  By limiting venue, the Constitution helps prevent the federal government from gaining an undue advantage or leverage that can come with the unbridled power to choose venue in a more sympathetic state.[25]

Lastly, the constitutional provisions serve to curtail federal governmental power against individual states, allowing each state the right to try the person who actually committed the crime within the state's territory.[26]

In the words of the Supreme Court:

> Questions of venue in criminal cases, therefore, are not merely matters of formal legal procedure.  They raise deep issues of

---

[24] See Note, Stretching Venue Beyond Constitutional Recognition, 90 Journal of Criminal Law & Criminology 951, 995 (2000).

[25] Id.

[26] Id. at 955-956; 979-982.

> public policy in the light of which
> legislation must be construed.

United States v. Johnson, 323 U.S. 273, 276 (1944).[27]

Accord, Travis v. United States, 364 U.S. 631, 634 (1961).
See also United States v. Goldberg, 830 F.2d 459, 465 (3rd Cir.
1987) ("The venue provisions of the Constitution are important
safeguards, protecting an accused from unfairness and hardship in
defending against prosecution by the federal government"); United
States v. Spriggs, 102 F.3d 1245, 1251 (D.C. Cir. 1996) ("The
concern over a distant district is critical, as '[t]he provision
for trial in the vicinity of the crime is a safeguard against the
unfairness and hardship involved when an accused is prosecuted in
a remote place, United States v. Cores, 356 U.S. 405, 407
(1958)'").[28]  See also United States v. Morgan, 393 U.S. 192,
195-196 (D.C. Cir. 2005)(conviction for receiving stolen federal
property reversed for improper venue).

It has long been settled that Article III means exactly what
it says.  If a crime against the laws of the United States is
committed outside the limits of any State within the United
States, the crime "is not local, but may be tried at such place

---

[27]  The venue protections of Article III and the Sixth Amendment
grew out of the Founding Fathers' complaint against the King of
England, listed in the Declaration of Independence, i.e., the King's
odious practice of transporting colonists "beyond the Seas to be
tried" in England "for pretended offenses."  The Declaration of
Independence, para. 21 (1776), cited in United States v. Cabrales,
supra, 524 at 6, n. 1.  See also Albert W. Alschuler & Andrew G.
Deiss, A Brief History of the Criminal Jury in the United States, 61
U. Chi. L. Rev. 867, 875 (1994).

[28]  Accord, United States v. Palma-Ruedas, 121 F.3d 841, 848 (3rd
Cir. 1997).

16

as Congress shall designate by law." United States v. Dawson, 56
U.S. 467, 488 (1853).[29]  However, if the crime is committed
within the territorial boundaries of any State, the crime is
local and must be tried in that State.  United States v.
Jackalow, 66 U.S. 484, 486 (1861); Jones v. United States, 137
U.S. 202, 211 (1890).  See also United States v. Johnson, supra,
323 U.S. at 275; United States v. Anderson, 328 U.S. 699, 704-705
(1946); Travis v. United States, supra, 364 U.S. at 634-635;
United States v. Cabrales, supra, 524 U.S. at 6-9.

     Thus, the issue presented here is whether the crime charged
in the indictment -- a § 963 conspiracy to violate § 959 -- was
committed in a State or States (and not in the District of
Columbia) or was committed outside the territorial limits of any
State.  If the former, the conspiracy must be prosecuted in the
State or States where it was committed (and not in the District
of Columbia); if the latter, it may be prosecuted in the District
of Columbia under 21 U.S.C. § 959(c) or 18 U.S.C. § 3238.

**B.    The Conspiracy Charged in the Indictment**

     As noted, the indictment charges the defendants with a
conspiracy under 21 U.S.C. § 963 to violate § 959(a), i.e., the
defendants in Guatemala, Nicaragua, and elsewhere conspired
sometime during the period from September 26, 2003, to

---

     [29]  In Dawson, the Supreme Court noted that Article III was
implemented by Congress in the first crimes act, 1 Statutes at Large,
p. 114, passed April 30, 1790, which provided that "the trial of
crimes committed on the high seas, or in any place out of the
jurisdiction of any State, shall be in the district where the offender
is apprehended, or into which he may first be brought."  56 U.S. at
488.

April 13, 2004, to distribute five or more kilos of cocaine outside the United States knowing that the drugs thereafter would be imported illegally into the United States.

Although the indictment is "bare bones," the basic facts of the alleged conspiracy are set out in the Government's Motion To Exclude Time Under The Speedy Trial Act (8):

> Beginning on or about September 26, 2003, and continuing until April 13, 2004, [defendants] conspired to send 400 kilograms of cocaine from Panama to a buyer in Las Vegas, Nevada . . . . Cobar represented the would-be buyer (who actually was a DEA source) in Las Vegas, Cruz-Garcia acted as the Central American-based broker for the deal, and Gonzalez-Largo was the supplier. Both Cruz-Garcia and Gonzalez-Largo told Cobar that Gonzalez-Largo was in possession of 800 kilos of cocaine in Panama. In February 2004, they tried to consummate the shipment, but failed due to problems involving the police and checkpoints in Panama. The shipment ultimately fell through when both Cobar and Gonzalez-Largo were arrested on unrelated charges. Government Motion at 1-2.[30]

Because the drugs were never actually distributed in Panama as planned, the question whether venue is proper under Article III narrows to whether defendants' conspiracy to distribute the drugs in Panama was or was not committed in a State or States of the United States.[31] To answer this question, we turn to the law

---

[30] These representations were incorporated by the Court in its Memorandum and Order (14) holding defendant Cobar without bail pending trial. Memorandum and Order at 2-3.

[31] Again, we note that for purposes of this motion only, we assume that defendants have committed the conspiracy at issue. See fn. 4 at 2.

of venue as it relates to the crime of conspiracy.[32]

### C.  The Law of Venue in Conspiracy Cases

#### 1.  The Nature of the Crime of Conspiracy

A "conspiracy is a partnership in crime." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 253 (1939). The "essence of a conspiracy is 'an agreement to commit an unlawful act.'" United States v. Jimenez Recio, 537 U.S. 270, 274-275 (2003), citing United States v. Iannelli, 420 U.S. 770, 775 (1975). The agreement itself is considered "a distinct evil," which "may exist and be punished whether or not the substantive crime ensues." Salinas v. United States, 522 U.S. 52, 65 (1997).[33]

At common law because the conspiratorial agreement itself was considered dangerous to the King, irrespective of the success of the agreement, the crime of conspiracy was indictable upon the formation of the agreement and no act in furtherance of the conspiracy was required. Hyde v. United States, 225 U.S. 347, 359 (1911).[34]

Although not required at common law, proof of an overt act in furtherance of the conspiracy was made an element of the early federal conspiracy statute (§ 5440 of the Revised Statutes),

_____

[32]  The locus delicti for constitutional venue analysis "must be determined from the nature of the crime alleged and the location of the act or acts constituting it." United States v. Cabrales, supra, 524 at 6-7, citing United States v. Anderson, supra, 328 U.S. at 703. Accord, United States v. Rodriquez-Moreno, 526 U.S. 275, 279 (1999); United States v. Morgan, supra, 393 F.3d at 196-197.

[33]  See generally Developments in the Law of Criminal Conspiracy ("Developments"), 72 Harv. L. Rev. 920, 922-927 (1959).

[34]  See Developments, supra, at 945-949.

which element continues to be part of 18 U.S.C. § 371.  See Hyde
v. United States, supra, 225 at 357.

In enacting the drug conspiracy statutes, 21 U.S.C. §§ 846
and 963, Congress went back to the early common-law understanding
of conspiracy and omitted the overt act requirement contained in
18 U.S.C. § 371.  This omission was approved by the Supreme Court
unanimously in United States v. Shabani, 513 U.S. 10, 15-16
(1994).[35]

### 2.  Where a Conspiracy Is Deemed To Have Been Committed for Purposes of Venue under Article III

If two or more persons enter into a conspiracy in a
particular State, the conspiracy is deemed to have been committed
in the State where the agreement was reached because the
agreement itself is the crime.  Thus, the State where the
conspiracy was formed is a proper forum for prosecution under
Article III.  Whitfield v. United States, supra, 160 L.Ed.2d 611,
620 (2005); Hyde v. Shine, 199 U.S. 62, 76 (1905).  See generally
Annot., Proper Venue -- Drug Conspiracy, 74 ALR Fed. 699 (1985).

Venue for a conspiracy prosecution is also constitutionally
proper in a State where an overt act in furtherance of the

---

[35]  Shabani deals with 21 U.S.C. § 846 and not § 963, the
conspiracy statute involved here; however, the Supreme Court's
rationale in Shabani appears to apply with equal force as regards
§ 963.  See Whitfield v. United States, 160 L.Ed.2d 611 (2005), in
which the Supreme Court unanimously held that no overt act is required
in a prosecution for conspiracy to launder money, 18 U.S.C. § 1956(h).

Several circuit courts have held that § 963 does not require
proof of an overt act.  E.g., United States v. Yonn, 702 F.2d 1341
(11th Cir. 1983); United States v. Grammatikos, 633 F.2d 1013 (2nd
Cir. 1980); United States v. Johnson, 575 F.2d 1347 (5th Cir.), cert.
denied, 440 U.S. 907 (1978).

conspiracy is committed, even where the conspiracy statute does
not require an overt act, e.g., 21 U.S.C. §§ 846, 963, and 18
U.S.C. § 1956(h).  Whitfield v. United States, supra, 160 L.Ed.2d
at 620.

In United States v. Haire, 371 F.3d 833 (D.C. Cir.2004),
vacated on Booker grounds, 125 S.Ct. 1014 (2005), our Court of
Appeals stated: "[W]e recognize the 'well established rule' that
prosecutions for [a drug] conspiracy 'may be brought in any
district in which some overt act in furtherance of the conspiracy
was committed by any of the co-conspirators,'" citing United
States v.Lam Kwong-Wah, 924 F.2d 298, 301 (D.C. Cir. 1991).  Id.
at 837.[36]  See generally Annot., supra, 74 ALR Fed. 669.[37]

**D.   The Conspiracy in this Case Was Committed in One or
More States of the United States and Thus May Not
Be Constitutionally Prosecuted in the District of
Columbia under 21 U.S.C. § 959(c) or 18 U.S.C. 3238.**

---

[36]  See also United States v. Mayo, 721 F.2d 1084, 1089-1091 (7th
Cir. 1984); United States v. Nicoll, 664 F.2d 1308, 1311 (5th Cir.
1982); United States v. Ramirez-Amaya, 812 F.2d 813, 816, (2nd Cir.
1987).

[37]  As noted, an overt act was not considered a necessary element
of the offense of conspiracy at common law.  Nonetheless, at common
law, venue could be had as to all the conspirators either in the
county where the agreement was formed or in any county in which an
overt act was committed by any one of the conspirators.  The first
rule was a natural consequence of the common-law concept that the
offense was deemed to have been completed with the formation of the
agreement itself; the second was generally reached by regarding the
overt act either as evidence of the conspiracy's existence in the
second county or as a renewal and continuation of the conspiracy
there.
Courts in jurisdictions that require an overt act as an element
of the offense, e.g, 18 U.S.C. § 371, are in accord.  Thus, in Hyde v.
Shine, supra, the Supreme Court noted that venue would lie in the
district where an agreement was formed even though no overt act was
committed there in that the overt act requirement was considered as
merely affording a "locus poenitentiae."  199 U.S. at 76.  See
Developments, supra, 72 Harv. L. Rev. at 975-976.

1.  **The Conspiracy in this Case Was Formed in Las Vegas, Nevada, and Thus Was Committed in the State of Nevada.**

If defendants Cobar, Cruz-Garcia ("Flaco") and Gonzalez-Largo ("Lucho") did enter into an agreement to sell to undercover officer Guerra 400 kilograms of cocaine in Panama knowing that the cocaine would be imported into the United States, they did so during a series of telephone calls that Cobar made from his phone in Las Vegas to Flaco in Guatemala and to Lucho in Costa Rica during December 8-13, 2003.[38]

For purposes of this motion only, these calls, which are discussed in detail at pages 7-8 (DISC 02243; 02246; 02470-02473; 02483; 02505; 02534; 02539-02540), show that as of December 13, 2003, Cobar, Flaco, and Lucho had come to an understanding that they were going to sell Cobar's client 400 kilograms of cocaine.

That the foregoing calls establish the basic narcotics conspiracy at issue is shown by the government's reliance on this series of calls in seeking an indictment against the three defendants in Las Vegas, Nevada.

On May 5, 2004, DEA Agent Anthony Casullo gave testimony before the Grand Jury as follows:

    Q.    And on December 10th of 2003, was a phone
          call intercepted between Mr. Cobar and a
          Victor Lnu, aka Flaco; is that correct?

    A.    Yes, it was.

    Q.    And could you tell us what the substance of
          that phone call was?

---

[38]  This argument assumes that the defendants did the acts referred to in the discovery materials cited herein.  See fn. 4 at 2.

22

A.    Yes.  On that day we listened to a phone call
between Rene Cobar and an individual known as
Flaco.  During the conversation, Flaco was
telling Rene [Cobar] that he had an
individual that would be able to supply Rene
who was going to, in turn, supply our
undercover officer with 400 kilograms of
cocaine, that this individual's name was
Lucho, that he was a member of a para-
military organization who also dealt with
cocaine; for Cobar to call this individual up
to arrange to have these narcotics shipped
into Las Vegas and to set up a meeting so
that one of our undercovers could meet with
him.

Q.    And that was the purpose of transporting 400
kilos of cocaine?

A.    That's correct, yes.

Q.    Approximately nine minutes later after Cobar
ends this phone call with Victor, aka Flaco,
he does call Lucho; it that correct?

A.    He does.

Q.    And has Lucho since been positively
identified as Luis Angel Gonzalez-Largo?

A.    That's correct.

Q.    And could you tell the Grand Jury the
substance of that call?

A.    During that call, we listened to a call
between Cobar and Lucho.  They discussed how
Cobar had a client here in Las Vegas.  He
worked for someone who was interested in
purchasing cocaine.  Lucho states that they
had 800 kilos available presently.  Cobar
said they were looking at 400 kilograms,
which is what they wanted to bring in.  They
decided to figure out how they wanted to do
this next, that they would talk with the
undercover officer and set up a meeting in
Panama where our undercover in Panama would
meet with Lucho to discuss how this would

23

transpire.  (Exhibit A (DISC 1602-1604))[39]

The foregoing calls as related by Agent Casullo (and described in the cited discovery materials) put the formation of the conspiracy squarely in Las Vegas.  Moreover, the Las Vegas indictment itself, which resulted from Agent Casullo's testimony, specifically charges that all three defendants in the State of Nevada conspired to violate the drug laws.  (Exhibit B)[40]

In short, assuming a narcotics conspiracy was committed by these three defendants (whether in violation of § 846 or § 963), the conspiracy was committed in the State of Nevada where it was hatched.

> **2.   The Conspiracy in this Case Was Furthered in Las Vegas, Nevada, and in Miami, Florida, and Thus Was Committed in the States of Nevada and Florida.**

At pages 8-10 we set out the post-December 8-13, 2003, activities of Cobar, Flaco, and Lucho contained in the discovery materials.  As can be readily seen, these activities by the three defendants[41] -- including numerous telephone calls from Cobar to Flaco and Lucho; numerous telephone calls from Cobar to Guerra and Carlos; and meetings between Cobar and Guerra, all of which

---

[39]   Agent Casullo gave no testimony about the aborted deal involving Cobar and Gutierrez that occurred prior to Cobar's contact with Lucho.

[40]   We note that although Cobar's counsel in Las Vegas successfully moved to dismiss the money laundering count for lack of venue, he made no such motion as regards the narcotics conspiracy.  Counsel obviously recognized that such a motion would be futile because unlike the money laundering charge, venue for the narcotics conspiracy count was eminently proper in Las Vegas, Nevada.

[41]   See fn. 4 at 2.

occurred either in Nevada or Florida -- furthered defendants'
December 8-13, 2003, conspiracy to sell 400 kilograms of cocaine
to Guerra.  Accordingly, all three defendants committed the
conspiracy by overt acts in the States of Nevada and Florida.

> **3.    Flaco and Lucho's Lack of Physical Presence
> in the United States Does Not Mean that They
> Did Not Commit the Conspiracy in the States
> of Nevada and Florida for Purposes of
> Article III and Sixth Amendment Venue.**

Flaco and Lucho's physical absence from the United States
when they formed the conspiracy with Cobar during the series of
calls on December 8-13, 2003, and when they used the phone with
Cobar to further the conspiracy does not mean that they did not
commit the conspiracy in the States of Nevada and Florida for
purposes of Article III and Sixth Amendment venue.

It is well settled that "[i]t is not necessary that [the
defendant] himself have entered the district, as long as one of
his co-conspirators did." United States v. Corona, 34 F.3d 876,
879 (9th Cir. 1994). See e.g., United States v. Parrish, 736
F.2d 152, 158 (5th Cir. 1984)(member of a conspiracy commits
conspiracy in any district where the conspiracy was formed or an
overt act took place, even if the individual has "never set foot"
in the district); United States v. Myers, 847 F.2d 1408, 1411
(9th Cir. 1988)("thus, where at least two of Myers' co-
conspirators committed numerous overt acts in Montana, venue was
proper in that district").

Moreover, there is no question that "phone calls can
constitute overt acts in furtherance of a conspiracy." United

25

States v. Naranjo, 14 F.3d 145, 147 (2nd Cir. 1994). And, it is clear that making phone calls from one jurisdiction into another jurisdiction establishes venue in the latter jurisdiction "so long as [the calls] further the ends of the conspiracy." Id. Accord, United States v. Duque, 123 Fed.Appx. 447, 449 (2nd Cir. 2005); United States v. Strickland, 493 F.2d 182, 187 (5th Cir. 1974)("telephone calls and conversations to and from Atlanta were overt acts" and established venue in Northern District of Georgia); United States v. Bartoli, 192 F.2d 130, 132 (4th Cir. 1951)(phone call of Bartoli from Chicago, Illinois, to co-conspirator in Huntington, West Virginia, in furtherance of conspiracy established venue in Southern District of West Virginia).[42]

The Supreme Court's decision in Burton v. United States, 202 U.S. 344 (1906), points up the settled principle that it is not necessary to be present in a jurisdiction in order to enter into or further a conspiracy.

In Burton, the defendant, who was in Chicago, sent a letter to a corporation in St. Louis, Missouri, in which he offered to perform services which were prohibited by law. The St. Louis corporation accepted defendant's offer via a telegram wired to

---

[42] Similarly, venue for the offense of using a phone to sell drugs, 21 U.S.C. § 843(b), is deemed to lie where the call originated from or where it was received. See e.g., United States v. Barnes, 681 F.2d 717, 725 (11th Cir. 1982)("[w]e hold that a § 843(b) offense is 'committed' for venue purposes both in the district where the call was made and in the district where the call was received."); United States v. Cordero, 668 F.2d 32 (1st Cir. 1981); United States v. Andrews, 598 F. Supp. 297, 298 (W.D. Wisc. 1984).

defendant who was still out of state.

In an opinion written by Justice Harlan, the Supreme Court held that for purposes of Article III and Sixth Amendment venue, the offense was "completed" and "committed" in Missouri when the defendant's offer was accepted by telegram, notwithstanding that the defendant was not personally present in Missouri when his offer was accepted and the agreement was completed.  Id. at 388. Justice Harlan summed up the rationale of the case thusly:

> The constitutional requirement is that the crime shall be tried in the State and District where committed, not necessarily in the State or District where the party committing it happened to be at the time. Id. at 387.  (Emphasis in original.)

See also United States v. Gilboe, 684 F.2d 235, 238-239 (2nd Cir. 1982)(under 18 U.S.C. § 3237(a), venue for wire fraud prosecution was proper in Southern District of New York where there were numerous telexes and telephone calls between New York and Hong Kong and other parts of the world, even though defendant was a nonresident alien whose acts occurred outside the United States; 18 U.S.C. § 3238 not applicable because section applies only to offenses "not committed in any district," as its title indicates").  Accord, United States v. Kim, 246 F.3d 186, 191-193 (2nd Cir. 2001)(under 18 U.S.C. 3237(a), defendant's causing communications to be transmitted into and out of Southern District of New York while he was overseas when he approved fraudulent invoices for payment by New York bank established venue in Southern District conspiracy prosecution, even though defendant did not personally send the transmissions and was not

27

in New York when he caused the transactions to be made).

In sum, defendants Cobar, Gonzalez-Largo, and Cruz-Garcia "committed" the charged § 963 drug conspiracy in the States of Nevada and Florida.[43]

> **4.    Under the Facts of this Case, the Conspiracy May Not Be Constitutionally Prosecuted under 21 U.S.C. § 959(c) or 18 U.S.C. § 3238.**
>
> >  **a.    The Government Has the Burden To Show that Venue Is Proper under § 959(c) or § 3238.**

At the outset we stress that because of the constitutional significance of proper venue, in this jurisdiction "the government bears the burden of establishing by a preponderance of the evidence that venue is proper with respect to each count charged against the defendant." United States v. Lam Kwong-Wah, supra, 924 F.2d at 301.[44] Respectfully, we ask the Court to be mindful of the government's burden as it considers the arguments made herein.

---

[43]   See fn. 4 at 2.

[44]   We have found no federal circuit that does not place on the government the burden of showing proper venue on each count charged. See e.g., United States v. Angotti, 105 F.3d 539, 541 (9th Cir. 1997); United States v. Wood, 364 F.3d 704, 710 (6th Cir. 2004); United States v. Salinas, 373 F.3d 161, 163 (1st Cir. 2004); United States v. Robinson, 275 F.3d 371, 378 (4th Cir. 2004); United States v. Chin, 378 F.3d 151, 159 (2nd Cir. 2004).
   Interestingly, because of the importance of the venue protections of Article III, the Ninth Circuit has held that venue in a particular district might be proper for a conspiracy count but not proper for a substantive count in furtherance of the conspiracy, notwithstanding Pinkerton.  In such a case, the substantive count must be dismissed leaving the government with the option to prosecute just the conspiracy count or to dismiss the conspiracy count and try all the counts in the district where the substantive count was committed and where venue would be proper as regards both the substantive count and the conspiracy count.  United States v. Corona, supra, 34 F.3d at 878-881.

28

**b.    The Government Cannot Meet Its Burden
To Show that Venue Is Proper under
§ 959(c) or § 3238.**

We note initially that we have found nothing in the
discovery materials to indicate that Cobar, Gonzalez-Largo, or
Cruz-Garcia ever "set foot" in the District of Columbia, either
by being physically present in the District or by making any
communications, <u>e.g</u>., phone calls, telexes, wire transfers, to or
from the District.

Accordingly, the issue presented is whether DOJ can meet its
burden to show that venue is constitutionally permissible under
21 U.S.C. § 959(c) or 18 U.S.C. § 3238.  We think not.

1.    Although Cobar (as well as his co-defendants) intended
to distribute 400 kilos of cocaine to Guerra's man in Panama City
on February 11, 2004 (as described at pages 9-11), knowing that
the drugs would be imported from Panama into the United States
with Las Vegas, Nevada, as their final destination,[45] the deal
never materialized -- there was no crime of narcotics
distribution as proscribed by 21 U.S.C. §959(a).

By its very terms, the venue proviso of § 959(c) "is
intended to reach <u>acts of manufacture or distribution committed</u>
<u>outside the territorial jurisdiction of the United States</u>."
(Emphasis added.)  Thus, only where there have been "acts of
manufacture or distribution" outside the United States does the
statute apply.  Here, however, it is undisputed that none of the
defendants committed <u>any</u> "act" of "distribution" of cocaine in

_____

[45]    <u>See</u> fn.4 at 2.

Panama or in any other country outside the United States.[46]

Accordingly, § 959(c) on its face does not apply to this case.

2.    Further, the narcotics conspiracy statute with which defendants are charged, 21 U.S.C. § 963, does not by its terms provide for venue in the District of Columbia for one who conspires to violate § 959(a).  The statute provides only that one who "conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense. . . ."  In effect, DOJ wants to rewrite § 963 to expand the special venue proviso of § 959(c) from "acts" of "manufacture or distribution" of drugs outside the United States to "conspiracies to commit acts of manufacture or distribution" outside the United States.

3.    As we have demonstrated, under the law of conspiracy, defendant Cobar (as well as his co-defendants) committed the conspiracy at issue in the States of Nevada and Florida.

We recognize, of course, that co-defendants Cruz-Garcia and Gonzalez-Largo committed overt acts solely outside the United States in furtherance of the conspiracy, e.g., the calls to and from Flaco and Lucho in Guatemala, Costa Rica, and Panama; the calls and meetings between Lucho and Jorge in Panama; and the unsuccessful efforts of Lucho to deliver drugs to Jorge in Panama.  Also, it can be argued that Cobar's calls to Flaco and

---

[46]    Indeed, the DEA's "sting" in this case produced not one gram of cocaine.

Lucho, although originating in Nevada and Florida, were committed in Guatemala and Costa Rica, where the calls were received.[47]

But, as shown, given defendants' extensive activity in the United States in forming and furthering the conspiracy, it does not follow that their "outside-the-U.S." activity means that they did not "commit" the conspiracy in the States of Nevada and Florida for purposes of Article III and the Sixth Amendment venue.

Indeed, the D.C. indictment alleges that the defendants committed the conspiracy "in Guatemala, Nicaragua, and elsewhere." (Emphasis added.) Under the facts of this case, the geographical "elsewhere" referred to in the D.C. indictment obviously includes Las Vegas, Nevada, and Miami, Florida.

In short, the D.C. indictment itself establishes probable cause that defendants committed the § 963 conspiracy in Nevada and Florida (as well as in Guatemala and Nicaragua).[48]

Simply put, DOJ cannot escape the legal conclusion that the defendants' illegal agreement to sell Guerra 400 kilos of cocaine

---

[47]   The discovery materials do not show that Cobar was ever outside the United States during the alleged time period of the conspiracy.

[48]   Although the fact of an indictment may not be considered as evidence of guilt in the eyes of the jury (Redbook Instruction No. 2.06), the return of an indictment in non-trial contexts constitutes probable cause that the accused committed the acts charged therein. Gerstein v. Pugh, 420 U.S. 103, 117 n. 19 (1975)(citations omitted). Courts routinely use the fact of an indictment to establish the rebuttal presumptions in the bail statute, 18 U.S.C. 3142. See United States v. Mosuro, 648 F. Supp. 316, 318 (D.D.C. 1986) ("indictment establishes probable cause sufficient to create a rebuttable presumption under Section 3142(e)")(opinion by J. Penn).

in Panama for importation into the United States was hatched in the State of Nevada and furthered in the States of Nevada and Florida.[49]

4.    DOJ's apparent reliance on § 959(c) for venue in the District of Columbia completely ignores the command of Article III that defendants' crime <u>shall</u> be tried in the State where the crime was committed.  To have proper venue in the District of Columbia under § 959(c), DOJ would first have to amend Article III, Section 2, Clause 3 to read as follows:

> The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State **or when committed in part within a State and in part outside any State**, the Trial shall be at such Place or Places as the Congress may by Law have directed.  (Amending language in bold.)

After amending Article III, DOJ would then have to turn to § 959(c) and amend it as follows:

> This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States **or committed in part outside the territorial jurisdiction of the United States and in part within the territorial jurisdiction of the United States.**  Any person who violates this section **or who conspires to violate this section as prohibited by subsection 963** shall be tried in the United States district court at the point of entry where such person enters the United States, or in the United States District Court for the District of Columbia. (Amending language in bold.)

---

[49]    <u>See</u> fn. 4 at 2.

Without the foregoing amendments to Article III and § 959(c), DOJ's reliance on the current language in §§ 959(c) and 963 is unavailing.

5.   If, in lieu of 21 U.S.C. § 959(c), DOJ is relying on the venue provisions of 18 U.S.C. § 3238 to prosecute the defendants in the District of Columbia, DOJ is in no better position.

Section 3238, which implements Article III, deals with "offenses begun or committed upon the high seas, or elsewhere <u>out of the jurisdiction of any particular State or district</u>."[50] (Emphasis added.)  Where a defendant's criminal activity is substantial both inside and outside the United States, as is the case here, § 3238 simply does not apply.

For example, in <u>United States</u> v. <u>Gilboe</u>, <u>supra</u>, the defendant, a citizen of Norway and resident of Hong Kong, entered into false contracts to ship grain while he was outside the United States.  To effect his fraud, he sent and received several telexes and phone calls between New York and Hong Kong.  684 F.2d at 237-239.

Indicted in the Southern District of New York for wire fraud and transportation of funds obtained by fraud, the defendant argued that the Southern District did not have venue, claiming that under 18 U.S.C. § 3238 venue was proper only in the district in which he was arrested, the District of Connecticut.  <u>Id</u>.

---

[50]   The heading of 18 U.S.C. § 3238 reads in bold: **"Offenses not committed in any District."**

The Second Circuit rejected this claim as follows:

> But defendant relies on the wrong section;
> § 3238 applies only to offenses "not
> committed in any district," as its title
> indicates.  But that is not the situation
> here.  The appropriate section to apply in
> this case is 18 U.S.C. § 3237(a) . . . .
>
>              *    *    *    *
>
> As already indicated, there were numerous
> telexes and telephone calls between New York
> and Hong Kong and other parts of the world.
> Also, the proceeds of the fraud were all
> transferred through New York so that "such
> commerce" moved "from, through, or into" the
> Southern District of New York.  Therefore,
> venue was proper in that district under
> [§ 3237(a) and not § 3238].  Id.[51]

Thus, to rely on § 3238, DOJ would have to rewrite the

statute as follows:

> The trial of all offenses begun or
> committed upon the high seas, or elsewhere
> out of the jurisdiction of any particular
> State or district, **or begun or committed in
> part out of the jurisdiction of any
> particular State or district and in part in
> the jurisdiction of any particular State or
> district**, shall be in the district in which
> the offender, or any one of two or more joint
> offenders is arrested or is first
> brought . . . . (Amending language in bold.)

6.    Lastly, if DOJ is intent on prosecuting defendants for

a § 963 conspiracy to violate § 959(a), as opposed to a § 846

conspiracy to violate § 841(a)(1),[52] DOJ can readily indict the

---

[51]    See also United States v. Kim, supra, 246 F.2d at 191-193.

[52]    For purposes of this motion only, we are of the view that the
alleged criminal conduct in this case makes out a § 846 conspiracy (as
well as a § 963 conspiracy).  Indeed, the DEA and the United States
(continued...)

§ 963 conspiracy charge in Las Vegas, Nevada, where (as shown) venue is proper for all three defendants.[53] Besides eliminating the venue issue, prosecution of the case in Las Vegas makes sense from a prosecutorial perspective.

• Most of DOJ's key witnesses -- the CI, the LVMPD undercover officer and LVMPD surveillance officers; the DEA agents who worked with LVMPD in investigating and developing the case against the defendants; the DEA agents who monitored the Title III wiretaps; and the DEA agents who establish chain of custody for much of the evidence in the case -- are all located in Las Vegas.

• As regards out-of-country witnesses, _e.g_., Jorge Rivera of the Policia Tecnica Judicial in Panama City, we see no reason why they could not come to Las Vegas just as easily as they could come to D.C.

---

[52](...continued)
Attorney in Las Vegas, as well as the Las Vegas Grand Jury, were of the view that defendants had violated § 846, and the defendants were indicted accordingly. (Exhibit B)

Because the penalties and the sentencing guidelines for the two conspiracies are the same, we fail to see why DOJ is pushing § 963, rather than § 846. In any event, as shown, venue for a § 963 conspiracy to violate § 959(a) (or to violate § 952) is proper in Las Vegas or New York, albeit improper in D.C.

[53] As indicated, venue in this case is technically proper in Miami, Florida, as well as Las Vegas, Nevada. Where venue is appropriate in two or more districts, many courts apply the "substantial contacts" test to determine venue. That test "takes into account a number of factors -- the site of the defendant's act, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate fact finding. . . ." United States v. Brika, 416 F.3d 514, 527 (6th Cir. 2005), quoting United States v. Reed, 773 F.2d 477, 481 (2nd Cir. 1985). Under this test, we believe that Las Vegas is a more appropriate venue than Miami. See discussion infra at 36-39.

• If the DOJ attorneys assigned to this case are better qualified to try § 959(a) violations than the Assistant United States Attorneys in Las Vegas, the DOJ attorneys can try the case themselves in Las Vegas.

As Mr. Gillies informed the Court at the July 19 status call, both he and Mr. Faulkner have already spent several days in Las Vegas going over the evidence with the witnesses and getting the case ready for trial. We understand that DOJ trial attorneys in the Narcotics and Dangerous Drug Section routinely try major narcotic cases outside of the District of Columbia, and it does not appear that Messrs. Faulkner and Gillies could not just as easily try the case in Las Vegas as they could in D.C.

• Lastly, there is no reason to believe that the federal district court judges in Las Vegas are not capable of trying a § 963 conspiracy to violate § 959(a), as opposed to a § 846 conspiracy to violate § 841(a)(1). Indeed, DOJ could request that the case be assigned to Judge Mahan, who is already familiar with the case, having handled it for 19 months before it was dismissed by the government.

In sum, considering the law of venue discussed herein and the evidence relevant to venue contained in the discovery materials, we submit that DOJ has fallen far short of meeting its burden to show that venue is proper in the District of Columbia for any of the three defendants.[54]

---

[54] Irrespective of whether venue is an element of the offense that should be submitted to the jury (see discussion in United States (continued...)

36

**5.    Defendant Cobar Does Not Waive His Constitutional Venue Rights in this Case.**

Like other constitutional rights, the right of an accused in a criminal trial to be tried in the State where he or she committed the offense, as guaranteed by Article III and the Sixth Amendment, may be waived.  See e.g., United States v. Evans, 62 F.3d 1233, 1236 (9th Cir. 1995).

In this case, defendant Cobar understandably chooses not to give up his constitutional venue rights.  After spending 19 months without bond in Las Vegas, Nevada, getting ready for his trial, defendant was unexpectedly uprooted from Las Vegas, Nevada, and sent to the District of Columbia to face trial for the very same conduct he was indicted for in Las Vegas.

DOJ's decision to bring the case in the District of Columbia for the convenience of the government has in a very real sense materially prejudiced the defendant.

1.    Defendant has lost the critically important support of his family that comes only from having his family nearby, able to visit him face-to-face in jail.  As the Court will recall from the bond hearing, defendant's family members in Las Vegas are very caring and supportive -- defendant's sister and brother-in-

---

[54](...continued)
v. Hart-Williams, 967 F. Supp. 73, 75-80 (E.D.N.Y. 1997)), in a case like this, where the defense has been provided with full discovery and is raising the issue of venue based on the evidence in the discovery materials (assuming the truth of the facts contained therein), it is appropriate for the Court to decide the venue issue pretrial.  See United States v. Carey, 152 F. Supp.2d 415, 419 (S.D.N.Y. 2001) ("[w]here as here, the government has provided the court with a full proffer of the facts it intends to introduce at trial to establish venue, the Court may decide whether venue is proper before trial.").

law offered to put up the equity in their house ($70,000) as collateral, and they further agreed that defendant could live in their home under house arrest pending trial.

2.   Defendant, who is Hispanic, has lost the right to be tried in a locale where Hispanics make up a over a quarter of the population and where the jury pool would consist of a far greater percentage of Hispanics than would be the case in the District of Columbia.[55]

3.   Defendant has lost the right to be tried in a jurisdiction where his counsel would have ready access to potential character witnesses who would not have the built-in reluctance to travel far from their homes and perhaps jeopardize their jobs by having to come to the District of Columbia to testify.

_____

[55]   According to the U.S. Census Bureau's 2004 American Community Survey, Nevada's population is 28.2% Hispanic and 10.4% Black or African American; D.C.'s population is 8.9% Hispanic and 57.8% Black or African American.  See http://factfinder.census.gov.

In holding that the Sixth Amendment right to trial by jury applies to state proceedings, the Supreme Court recognized the importance to the accused of having the jury drawn from the state and district in which the crime allegedly occurred.  Duncan v. Louisiana, 391 U.S. 145, 151-153 (1968).  The Court noted that the right of an accused to a jury trial in the "vicinage" of his or her "equals and neighbors" was adopted by the First Continental Congress in the Resolve of October 14, 1774, and can be traced back to the Magna Carta.  391 U.S. at 151-152, citing 4 W. Blackstone, Commentaries on the Laws of England 349-350 (Cooley Ed. 1899).

The importance of the "vicinage" guarantee of the Sixth Amendment also underlies in part the protections of Batson v. Kentucky, 476 U.S. 79 (1986), prohibiting the striking of jurors because of race or gender.  As the Court noted, "the very idea of a jury is a body . . . composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds." Id. at 86.  (Emphasis added.)  Under Batson, Hispanics are a cognizable racial group.  Sanders v. Woodford, 373 F.3d 1054, 1068 (9th Cir. 2004).

38

4.   Lastly, defendant has lost those precious intangible emotional comforts that come from just being in a place that he is familiar with -- where he has spent 10 years of his life -- emotional comforts that helped him face each day as he awaited his trial.

These very losses are exactly the kinds of losses that the Founding Fathers wanted to protect against by wording Article III and the Sixth Amendment the way they did.[56]

It is no wonder why defendant Cobar has chosen to stand firm in this case and insist that he be tried in a proper forum as guaranteed by the Constitution.

## CONCLUSION

For all of the foregoing reasons, defendant Cobar respectfully asks the Court to dismiss the indictment against him for lack of venue.[57]

Respectfully submitted,


_____/s/_____
James L. Lyons  (50690)
Kellogg, Williams & Lyons
1925 K Street, N.W., Suite 200
Washington, D.C.  20006
(202) 496-0722

---

[56]   Again, we cite United States v. Johnson -- "Questions of venue in criminal cases are not merely matters of formal legal procedure.  They raise deep issues of public policy."  323 U.S. at 276. See also Note, supra, 90 J. of Crim. & Criminology at 995.

[57]   When venue is improper in a criminal case, the indictment must be dismissed because a district court has no power to transfer such a case to a proper venue.  United States v. Hilger, 867 F.2d 566, 568 (9th Cir. 1989), citing United States v. Swann, 441 F.2d 1053, 1054 (D.C. Cir., 1971).

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing was electronically served on all interested parties on this 31st day of July, 2006.

_____/s/_____

James L. Lyons

40